## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

BRADLEY W.,

                                  Plaintiff,

      v.                                       5:19-CV-1217
                                               (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                 Defendant.

HOWARD D. OLINSKY, ESQ. for Plaintiff
TIMOTHY S. BOLEN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

      This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

      Plaintiff filed an application for Supplemental Security Income ("SSI") on April 6, 2012, alleging disability beginning July 27, 2016. (Administrative Transcript ("T.") 70, 147-52).  The application was initially denied on September 14, 2016. (T. 70, 77-80).  Plaintiff made a timely request for a hearing, which was held on July 19, 2018 before Administrative Law Judge ("ALJ") Jennifer Gale Smith. (T. 28-69).  On September 7, 2018, ALJ Smith issued an unfavorable decision. (T. 15-23).  The Appeals Council denied plaintiff's request for review of the ALJ's decision. (T. 1-6).

## II.   **GENERALLY APPLICABLE LAW**

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity
> that he is not only unable to do his previous work but  cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be hire
> if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled with-out considering vocational
> factors such as age, education, and work experience… Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual functional

2

capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   **FACTS**

Plaintiff testified that he was 41 years old at the time of the ALJ's hearing, and that he failed to finish the ninth grade in school,[1] when he was "kicked out" for being an "angry child." (T. 33-34).  However, plaintiff told the ALJ that he was not an "angry adult" because his mother "was able to help get that out of [him]." (T. 34).  Plaintiff testified how his mother's subsequent, sudden death was very difficult for him. (T. 34-35).  Plaintiff testified that he had not worked since he was approximately 25 years old, and that he was hired at "Best Buy" only because his father was a manager there at the time and helped him get the job. (T. 35-36).  Plaintiff testified that, when he attempted to get vocational training,[2] he was turned away because he was not "physically" handicapped enough. (T. 36).  Plaintiff testified that he never received any training, even though he was on SSI when he was a child "until Social Security just dropped

---

[1] Later, plaintiff testified that he was always in Special Education classes. (T. 45-46).

[2] Plaintiff could not remember the name of the organization to which he applied for training, but testified that he was not able to find anywhere else to apply after he was turned down. (T. 36-37).

me."[3] (T. 37).

Plaintiff testified that he was unable to work because he could not be around people. (T. 37).  He stated that when he tried to work at Best Buy, he had an "emotional breakdown" after his grandmother passed away, and he got "too stressed" because he was left with "everyone's work." (*Id.*)  He testified that he "broke down emotionally," began to cry, and walked out of the store. (*Id.*)  However, he stated that he did not know "the whole situation" at Best Buy.[4] (*Id.*)

Plaintiff testified that he lived "upstairs" from his younger brother, and that another brother owned the home. (T. 37-38).  Plaintiff's nephews lived "downstairs." (T. 38).  Plaintiff testified that he got along with his younger brother, but that he and his older brother did not "talk too much." (*Id.*)  Plaintiff testified that his eighteen-year-old nephew and his nephew's seven-week-old puppy were currently living with plaintiff. (T. 38-39).  Plaintiff's nephew helped him. (T. 39).  Before his nephew was there to help him, plaintiff's father or his brother Erin took plaintiff to buy groceries at Walmart. (T. 39).  Plaintiff testified that he would run into the store, "grab" what he needed and would leave immediately. (*Id.*)

Plaintiff testified that he only ate once per day, and that he cooked TV dinners in the microwave oven. (T. 39-40).  His nephew occasionally helped plaintiff warm the TV dinners up in the oven.  Plaintiff testified that his brothers helped him with

---

[3] It appears that plaintiff may have received "child's benefits" through Social Security until he was 22 years old.

[4] Later, plaintiff testified that, one of the reasons plaintiff left Best Buy after his father stopped working there was that he did not know or trust anyone, and there were "a lot of problems with that job." (T. 49).

"everything," but he was "pretty sure" that he could use the microwave oven himself. (T. 40).  Plaintiff stated that, although he got help with his laundry, he did all of his own dishes and other housework. (T. 41).  Plaintiff then stated that he could "probably much do [sic] almost what people can do except for it takes me longer." (T. 41).  Later plaintiff testified to a variety of household chores that he did. (T. 43).  He testified that his mother taught him how to clean, and that he was "not helpless in that way." (*Id.*) Plaintiff stated that he could not work around other people because he did not trust them, and they were always putting him down. (T. 41).  Plaintiff stated that when he was "younger," he "used to go after people," but "now," he just stayed away from them. He found it easier to stay home and not "go around" people. (*Id.*)

For "fun," plaintiff watched television or did jigsaw puzzles that his mother gave him before she passed away. (T. 41, 43).  He watched movies, but did not like to watch ones that he had seen before because that was "boring." (T. 43).  Plaintiff later testified that he did not have a television, and that he watched movies on his computer. (T. 56). He explained how he was able to get movies on his computer by going to "IceFilms."[5] (*Id.*) Although plaintiff admitted that he could read, "for the most part," he did not have any books, nor did he look at the newspaper. (T. 41-42).  Plaintiff testified that he used a paper and pencil to do "math," but that he might be able to use a calculator if he "needed to." (T. 42).

Plaintiff did not socialize with his family because they were always busy, but sometimes, his nephews and nieces came to visit him. (T. 43-44).  Plaintiff also testified

---

[5] Later, plaintiff testified that his father and his friend Mike taught him how to go onto the computer to access movies. (T. 58-59).

that he went to visit his father, who lived two blocks away from him. (T. 44).  Plaintiff
stated that he walked to see his father. (T. 44).  Plaintiff testified that he did not have a
driver's license, and that his sister drove him to the hearing. (T. 46).  He stated that, if
his sister had not driven him to the hearing, he would have gotten lost or shown up late
"for several different reasons." (T. 46).  Plaintiff stated that he did not like being around
other people, and that he had gotten into "fights" on his way to "appointments." (*Id.*)
Plaintiff stated that his father found him "bloody on a street an hour later when he [came
looking for him.]" (*Id.*)  Plaintiff admitted that the fights were "a long time ago," but
then stated that if he got into a fight "now," he would probably kill somebody, so it was
"good" that he stayed at home. (T. 47).

Plaintiff testified that he had been "in prison" when he was "a teenager," and
when the ALJ pointed out that it was "a long time ago," plaintiff stated that "everything
was a long time ago for him because he stayed home. (*Id.*)  Plaintiff testified that, when
his mother was alive, she did everything for him.  She taught him how to clean, helped
him study, calmed him down, and was "everything" to him. (T. 48).  Plaintiff testified
that he sat in his house, and did not do anything. (*Id.*)  Plaintiff stated that he was
"waiting for the day," that he could "meet" his mother again, and that he did not want to
get into trouble because there would not be "anyone" there for him. (*Id.*)  His brothers
had "their own problems," and he was concerned that his father would die because he
would not quit smoking. (*Id.*)  Plaintiff testified that he had "thoughts" of hurting
himself every day. (T. 49).  However, plaintiff stated that "every day" he woke up and
found reasons not to hurt himself. (T. 50).  He stated that his little nephews would not

understand.[6] (*Id.*)

Plaintiff testified that he was going to counseling at the "Brownell Center" every Thursday, and that he would never miss an appointment unless his counselor Kelly let him know she was not going to be there. (*Id.*)  He took a "medical cab" to get to his counseling appointments. (*Id.*)  Plaintiff testified that he was in a depressed mood "half the time." (T. 52).  He had energy some days, but some days he stayed in bed until 3:00 p.m. or until his nephew came to get him. (T. 53).  Plaintiff stated that he had trouble focusing, and he only slept about five hours per night, often waking up frequently. When he woke up, he took medication so that he could sleep until nine or ten in the morning. (*Id.*)

Plaintiff testified that he did not "go around" others because he was afraid of what he might do and what "they" might do. (T. 54).  It was "better" for him to just sit at home. (*Id.*)  Plaintiff testified that he could probably work "a few hours a day without having any complications," but he would just "rather" be by himself. (T. 55).  Plaintiff stated that "it's just finding the work," because he had no past work experience, and employers would not hire him. (*Id.*)  Plaintiff testified that he applied to work as a cashier at "Little Caesar's," but that the company turned him down and hired a fifteen-year-old girl for the position the next day. (T. 55-56).

Plaintiff testified that, sometimes, his brother asked plaintiff to come downstairs and help him clean the house. (T. 56).  He went shopping with his family twice per

---

[6] Later plaintiff testified that he would think of his nephews in an effort to dismiss the thoughts of hurting himself. (T. 53).  Plaintiff stated that he was told that if those thoughts did not help, he should "just get out," find a family member, and stay with him or her. (T. 53-54).

month, and his father or brother took him down to Social Services to "recertify" for Public Assistance benefits, although someone had to explain how to fill out the paperwork every time he went there. (T. 57-58).

The ALJ heard testimony from Vocational Expert ("VE") Marissa Howe. (T. 60-67). The ALJ asked VE Howe a hypothetical question in which he asked her to assume an individual who could perform work at all exertional levels, but was restricted to performing simple, routine, repetitive tasks. (T. 60). The hypothetical individual was limited to working in a "low-stress job," which was defined as a job requiring only occasional decision-making and the occasional use of judgment, with only occasional changes in the work setting. (*Id.*) The individual would be limited to goal-oriented, rather than "production paced rate" work. The individual should only have "occasional, superficial" contact with supervisors, co-workers, and the public. (*Id.*)

The VE named unskilled jobs at various exertional levels, including medium (cardboard box maker, floral greens tier, and janitor); light (ticketer/tagger, garment sorter, label coder, and laundry folder); and sedentary (ceramic tile examiner, lens inserter, stuffer, and dowel inspector). (T. 61-65). VE Howe testified that an individual could be "off-task" up to 20% of the workday in addition to regularly scheduled breaks, but any more than 20% would not be tolerated for continued employment. (T. 65). An employer would also tolerate up to two absences per month. (T. 65-66). In response to a question by plaintiff's counsel, the VE testified that an individual would not be able to perform *any* of the jobs if he could only "rarely" perform low stress, simple or complex tasks independently; maintain a schedule or attend to a daily routine; interact with others and maintain socially appropriate behavior without exhibiting behavioral extremes;

9

maintain attention and concentration for even rote tasks; and function in a work setting. (T. 66-67).  The above limitations would preclude all employment in the national economy. (*Id.*)

## IV.   <u>THE ALJ'S DECISION</u>

After finding that plaintiff had not engaged in substantial gainful activity ("SGA") since his SSI application date of July 27, 2016, the ALJ determined that plaintiff's disruptive mood regulation, mood disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), and bereavement were severe impairments for purposes of step two of the sequential evaluation. (T. 17-18).  The ALJ found that "no other medical disorder mentioned in the record has been established as a 'severe' impairment," meeting the 12-month duration requirement. (T. 18).  These impairments included his gastroesophageal reflux disease, lower back pain, and "dental issues."[7] (*Id.*)

At step three of the sequential evaluation, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (T. 18).  In making this determination, the ALJ considered Listings 12.04 (depressive, bipolar, and related disorders); 12.06 (anxiety and obsessive-compulsive disorders); and 12.15 (trauma and stressor-related disorders). The ALJ followed the "special technique," established by the agency for determining whether plaintiff suffered from a listed impairment.  The special technique includes determining the functional limitations imposed by plaintiff's impairments in each of

---

[7] Plaintiff had all of his teeth removed due to an infection. (T. 54).  At the time of the hearing, plaintiff had no teeth. (*Id.*)  The ALJ found that plaintiff did not experience any "work-related" functional limitations as a result of the removal of his teeth, "particularly after he was fitted for dentures." (*Id.*)

four broad areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. (T. 18).  In order to meet the severity of a listed impairment, plaintiff must have at least two "marked" limitations or one "extreme" limitation in the broad areas of functioning. (*Id.*)  Based on the record, the ALJ found that plaintiff had "moderate" limitations in all of the broad areas cited above.  Therefore, the ALJ found that plaintiff did not satisfy the "B" criteria of the listings.  The ALJ also considered the "C" criteria and found that plaintiff failed to establish that he had only "marginal adjustment," defined as a minimal capacity to adapt to changes in his environment or to demands that are not already a part of his daily life. (T. 19).

The ALJ noted that the limitations identified in "'paragraph B'" did not constitute an RFC assessment, but were used to rate the severity of a mental impairment at steps two and three of the sequential evaluation. (T. 19).  The RFC assessment at steps four and five required more detailed findings.

At step four, the ALJ found that plaintiff had the RFC to perform simple, routine, and repetitive tasks at all exertional levels. (T. 19).  Plaintiff would be limited to low stress jobs as defined above, and should do "goal-oriented" work, rather that production pace rate work. (*Id.*)  Plaintiff should have only occasional, superficial contact with co-workers, supervisors, and the public. (*Id.*)  In making this determination, the ALJ weighed the medical and other evidence of record, finding that the medical source statement ("MSS") by consultative psychologist, Jeanne Shapiro, Ph.D. should be given "partial evidentiary weight," disagreeing only with Dr. Shapiro's estimate that plaintiff would have moderate limitations in his ability to maintain a schedule. (T. 20).  The ALJ

11

gave partial weight to the MSS by T. Harding, a non-examining State Agency consultant, but determined that Dr. Harding's opinion was an "underestimate" of the plaintiff's limitations, given the counseling records obtained at the hearing level.[8]

The ALJ gave "little weight" to the "employability assessment" forms completed by the plaintiff's social worker, Kelly Kelodziejski, LCSW for the Department of Social Services ("DSS"). (T. 20). The ALJ found that the standards for DSS were different than the standards for Social Security, and the MSS restrictions were contradicted by the objective findings in the record, including her own findings on examination. (*Id.*) The ALJ then reviewed some of the inconsistencies that he found. (T. 20-21). The ALJ also considered plaintiff's daily activities in determining the RFC. (T. 21).

The ALJ found that plaintiff had no previous work experience, but based on the RFC and the testimony of the VE, determined that plaintiff could perform work in the national economy.[9] (T. 22). The ALJ cited the jobs of cardboard box maker, floral

---

[8] Dr. Harding's MSS stated that plaintiff had mild limitations in the first three broad areas of functioning and no episodes of decompensation. (T. 74). The court notes that Dr. Harding was utilizing an older version of the psychiatric technique. The broad areas of functioning were restriction in daily activities; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence, and pace; and repeated episodes of decompensation, each of extended duration. (T. 74). The newer amended broad areas of functioning do not include "episodes of decompensation," rather as stated above, the broad areas of functioning are now: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself.

[9] The ALJ discussed the sequential analysis and use of the Medical Vocational Guidelines ("the Grids"). (T. 22). The Grids direct a finding of disabled or not disabled based on age, education, and previous work experience at different exertional levels. However, when a plaintiff's ability to perform work at all exertional levels is compromised by additional non-exertional limitations, the ALJ must determine the extent to which the additional limitations erode the occupational base of work at any particular exertional level. (*Id.*) The Grids are then used as a "framework" for decision making. (*Id.*) Plaintiff's additional limitations have compromised his ability to perform at all exertional levels, thus, the ALJ consulted the vocational expert for her opinion regarding the extent to which the occupational base was eroded. The ALJ selected the jobs based on the VE's testimony. (*Id.*)

greens tier, and janitor, all jobs involving medium exertional ability. (*Id.*)  Therefore, the

ALJ determined that plaintiff was not disabled from the date of his SSI application to

the date of her decision. (T. 23).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of his position that the ALJ's

decision is not supported by substantial evidence:

1.   The ALJ's RFC determination was not supported by substantial evidence because she failed to properly explain the weight she gave to "professional sources." (Pl.'s Br. at 6-12) (Dkt. No. 9).

2.   The ALJ erred in her discussion of the Psychiatric Review Technique at step three. (Pl.'s Br. at 13-15).

Defendant argues that the Commissioner's decision is supported by substantial

evidence. (Def.'s Br. at 6-16) (Dkt. No. 10).  For the following reasons, this court agrees

with the defendant and will affirm the Commissioner's decision.

## VI.   Listed Impairment

### A.   Legal Standards

At step three of the disability analysis, the ALJ must determine if plaintiff suffers

from a listed impairment.  *See* 20 C.F.R. §§ 404.1520, 416.920.  It is the plaintiff's

burden to establish that his or her medical condition or conditions meet all of the

specific medical criteria of particular listed impairments.  *Gabriel C. v. Comm'r of Soc.*

*Sec.*, No. 6:18-CV-671 (ATB), 2019 WL 4466983, at *4 (N.D.N.Y. Sept. 18, 2019)

(citing inter alia *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  "Nonetheless, the ALJ is

required to explain why a claimant failed to meet or equal the listings [w]here the

claimant's symptoms as described by the medical evidence appear to match those

described in the Listings." *Ramirez Morales v. Berryhill,* No. 6:17-CV-6836, 2019 WL 1076088, at \*3 (W.D.N.Y. Mar. 7, 2019) (quoting *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (citation and internal quotations omitted)).  If a plaintiff's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify.  *Debra E. v. Comm'r of Soc. Sec.*, No. 6:18-CV-513 (NAM), 2019 WL 4233162, at \*6 (N.D.N.Y. Sept. 6, 2019) (quoting *Sullivan v. Zebley,* 493 U.S. at 530).  In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

## B.  Application

Plaintiff argues that the ALJ's "discussion" of the Psychiatric Review Technique at step three was not supported by substantial evidence.  Plaintiff appears to make two arguments.  First, plaintiff argues that the ALJ's assessed limitations for the "paragraph B" criteria are not supported by substantial evidence, and second, that the ALJ did not properly evaluate whether the plaintiff's impairments "medically equaled" the severity of a listed impairment. Although plaintiff makes these arguments last, it is more appropriate to discuss step three prior to his argument regarding step four of the sequential analysis.  Thus, the court will address plaintiff's listing arguments first.

When the state agency examiner, T. Harding, Ph.D., conducted the plaintiff's review at step three, he or she found that plaintiff's mental impairments were not severe. (T. 74).  As stated above, Dr. Harding used the former broad areas of functioning in making this determination. (*Id.*)  The ALJ considered plaintiff's mental impairments in conjunction with the new standard. (T. 18).  In addition on March 27, 2017, the Social

14

Security Administration issued a new Social Security Ruling governing these step three adjudications. Social Security Ruling ("SSR") 17-2p. SSR 17-2p, 2017 WL 3928306 (March 27, 2017).  SSR 17-2p rescinded and replaced SSR 96-6p. 2017 WL 3928306, at *1.  Among other things, this ruling discussed how ALJ's determine equivalence to a listed impairment.

In making the step three determination, the ALJ considered Dr. Shapiro's MSS, and found that the plaintiff did not have two marked or one extreme limitation in the four broad areas of functioning. (T. 18-19).  Plaintiff takes issue with the ALJ's finding that plaintiff had a "moderate" limitation in interacting with others and in maintaining attention and concentration, when Dr. Shapiro found only that plaintiff was "cooperative with adequate social skills," and his attention, concentration, and recent and remote memory skills were all intact. (Pl.'s Br. at 13).  Plaintiff argues that the ALJ did not further discuss plaintiff's inability to interact with others at step three, and the ALJ has not adequately explained why a "moderate limitation is sufficient [in maintaining attention and concentration] as opposed to marked," particularly when the record contained reports, written by plaintiff's treating social worker, LCSW Kolodziejski, stating that plaintiff's limitations in maintaining attention and concentration were "severe." (*Id.*)

It appears that plaintiff is arguing that, if the ALJ found that plaintiff was more limited than Dr. Shapiro indicated, the ALJ did not "adequately" explain why she found that the additional limitations were "moderate," rather than "severe," because LCSW Kolodziejski found severe limitations.  The plaintiff argues that the ALJ took "raw" data from Dr. Shapiro and improperly determined what additional limitations were

15

appropriate.  The ALJ did not discuss LCSW Kolodziejski's reports until step four of the sequential evaluation, but explained why she did not give more weight to those reports.  The ALJ noted, inter alia, that DSS employability reports are based on different standards than Social Security. (T. 20). Plaintiff must meet the Listing standards specifically.

The ALJ assessed greater limitations for purposes of the listing evaluation than Dr. Shapiro discussed in her consultative report.  While the ALJ may not use "raw evidence" in making her determination, when there is other evidence supporting the ALJ's assessment in the record, and the ALJ's determination is more favorable to the plaintiff, any error would be harmless. *Shorter v. Comm'r of Soc. Sec.*, No. 5:12-CV-1502 (NAM/ATB), 2014 WL 1280459, at *10 (N.D.N.Y. Mar. 27, 2014). *See Threatt v. Comm'r of Soc. Sec.*, No. 19-CV-25 (JJM)*, 2020 WL 4390695, at *5 (W.D.N.Y. July 31, 2020) (where the ALJ's RFC assessment is more restrictive than the medical opinions of record, it is generally not a basis for remand); *Cote v. Berryhill*, No. 3:17-CV-1843 (SALM), 2018 WL 4092068, at *24 (D. Conn. Aug. 28, 2018) (same).  The cases cited all deal with an ALJ's determination of RFC, but this proposition is equally applicable to the ALJ's step three determination.  In addition, as discussed below, the ALJ's RFC determination, based on Dr. Shapiro's evaluation, together with the other evidence of record is also supported by substantial evidence.

Plaintiff cites *Vincent v. Berryhill*, No. 16-CV-527 (A), 2018 WL 4705594, at *2 (W.D.N.Y. Oct. 2, 2018), which held that even though the ALJ may deviate from a medical opinion, she may not use that opinion as a "baseline" and then use "raw evidence" to determine how much more limited the plaintiff is. (Pl.'s Br. at 13).  *Vincent*

involved an RFC determination in which, after finding that plaintiff could only do sedentary work, the ALJ then appeared to be interpreting MRI evidence to determine that further restrictions were not appropriate.  In this case, the ALJ was considering whether plaintiff met a listed impairment, and she explained why she found that plaintiff's restrictions did not rise to the level of "marked" or "extreme" limitations. (T. 18).  The ALJ discussed Dr. Shapiro's findings together with the plaintiff's testimony to show that, although he might be more restricted in some areas than Dr. Shapiro opined, plaintiff's limitations did not rise to the level of "marked" or "extreme" in any of the four broad areas.

With respect to the determination of "equivalency," SSR 17-2p reads as follows:

> If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

2017 WL 3928306, at *4.  The Ruling does not require the ALJ to articulate specific evidence if she finds that plaintiff's impairment does not medically equal a listed impairment, and an analysis which is made part of step four will be "sufficient." (*Id.*) Therefore, the ALJ in this case did not err in failing to specifically address equivalence.

In any event, "the absence of an express rationale for an ALJ's conclusions does not prevent [the court] from upholding them so long as we are 'able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that [her] determination was supported by substantial evidence.'" *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112-13 (2d Cir. 2010) (quoting *Berry*, 675 F.2d at 469).  I will thus, proceed to discuss whether the ALJ's ultimate determination is supported by substantial evidence.

## VII.   RFC/Weight of the Evidence

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Weighing Evidence

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner,

the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B.    Application

Plaintiff argues that the ALJ erred in giving only "partial weight" to the opinions of plaintiff's treating social worker LCSW Kolodziejski, and that the ALJ was required to "explain" his reasons for doing so. (Pl.'s Br. at 6-7).  Plaintiff argues that the same rules apply to the analysis of treating medical sources who are deemed not "acceptable medical sources" as apply to treating physicians. (*Id.*)  The ALJ did not give LCSW's opinion less weight because she was not an "acceptable medical source."  The ALJ did not even mention whether she was an acceptable source, and instead, evaluated her opinions based on the other medical evidence in the record, particularly Dr. Shapiro's consultative evaluation. (T. 20-21).  In fact, as argued by defendant, "consistency" and "supportability" are, and have always been, important factors in the analysis of any medical report, even that of a treating physician.[10] *See also Estrella v. Berryhill*, 925

---

[10] Even under the new regulations, governing the analysis of medical evidence, which apply only to claimants applying for benefits after March 27, 2017, supportability and consistency are key factors that the ALJ must consider. *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("Revisions to Rules"), 82 Fed. Reg. 5844, 5853, 2017 WL 168819 (Jan. 18, 2017). *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68. Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c). These new regulations do not apply to this plaintiff.  In any event, he does not have a treating "physician" for his mental impairments.  Thus, the ALJ is not

F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)).

LCSW Kelodziejski completed Onondaga County DSS Forms for Employability. (T. 290-91, 292, 303, 304-305, 306).  These forms included "check boxes" for various limitations and assessments of whether and for what period of time plaintiff could perform work.  The ALJ first correctly pointed out that such assessments are "based on different standards of disability." (T. 20).  In addition, when LCSW Kelodziejski first began completing these forms, she assessed greater limitations than she listed in the most recent forms. (T. 290-91, 292, 303, 304-305, 306).

On January 12, 2017, LCSW Kelodziejski checked "severely limited" in all areas but maintenance of personal hygiene. (T. 304).  On June 13, 2017, LCSW Kelodziejski checked boxes stating that plaintiff would have a "severe" limitation in most of the activities listed, including the capacity to follow, understand, and remember "simple" instructions and directions; work with others; maintain a schedule; maintain attention; and "function in a work setting." (T. 306).  LCSW Kelodziejski opined that plaintiff would have "moderate" restrictions in performing "low stress," simple, and complex tasks independently and maintaining personal hygiene. (*Id.*)  She stated that plaintiff exhibited "extreme" temper and aggressiveness, and he should not work with others. (*Id.*)  She also checked a box stating that plaintiff "appears totally disabled." (T. 305).

However, on September 21, 2017, LCSW Kelodziejski checked boxes indicating that plaintiff was only severely limited in interacting with others and maintaining

---

required to afford any opinion "controlling weight."

socially appropriate behavior; maintaining attention and concentration for "rote" tasks; and the ability to function in a work setting. (T. 292).  Plaintiff had only moderate limitations in the areas of following, understanding, and remembering simple instructions; performing low stress, simple and complex tasks independently; and maintaining a schedule or routine. (*Id.*)  Plaintiff had no limitation in maintaining basic standards of personal hygiene. (*Id.*)  She also checked a box, indicating that plaintiff should engage in "no activity" except treatment or rehabilitation for four to five months, but that he was not permanently disabled. (T. 291).

On February 15, 2018, LCSW Kelodziejski checked the same boxes as her September 2017 form with respect to the plaintiff's degree of limitation, but also checked a box indicating that plaintiff could perform "part time" work for three hours per week for four or five months. (T. 289).  Under a section, entitled "reasonable accommodations," she listed his inability to work with the public and his lack of transportation. (T. 289).  The ALJ correctly noted that LCSW Kelodziejski's check-box forms were contradicted by her own evaluation, stating that plaintiff had normal psychomotor behavior, normal speech, cooperative behavior, "controlled impulsivity," and no suicidal or homicidal ideation.[11] (T. 20, 309).  The ALJ also correctly noted that plaintiff's lack of transportation was not relevant for purposes of Social Security disability. (T. 20).

---

[11] This evaluation is not dated, but the handwritten notes on the document indicate that it was completed one year after plaintiff's mother passed away. (T. 309).  Although it is not completely clear from the record, one of LCSW Kelodziejski's notes indicates that the diagnosis of bereavement was made in February of 2016. (T. 306).  However, in a different report, the "date identified" for the bereavement is listed at 3/20/16.  In either event, the evaluation in question may have been written in 2017.

Plaintiff argues that, although LCSW Kelodziejski stated in one of her progress notes, that plaintiff was managing his anger over the loss of his mother, and he did not need "further work" in this regard, she also listed "impulsivity and anger" as a "separate point." (Pl.'s Br. at 10) (*See* T. 323, 325).  LCSW Kelodziejski's note, dated June 25, 2017, states that the plaintiff is "managing his anger over the loss of his mother effectively and is gradually improving in his ability to discuss and experience the pain that comes with grief." (T. 325).  It is true that plaintiff's "impulsive and aggressive reactivity" is listed separately from his issues with grief and loss. (T. 323).  However, in another evaluation, which may have been written in 2017, she states that his "impulsivity" generally was "controlled."[12] (T. 309).  Although this evaluation also has a box checked indicating "auditory" and "visual" hallucinations, there is absolutely no other indication in the record that plaintiff suffers from any type of hallucinations.

LCSW Kelodziejski's more restrictive limitations were also inconsistent with plaintiff's own testimony.  The ALJ stated that "the claimant has maintained a broad range of daily activities that is consistent with the established [RFC]."  His activities suggest "a much higher level of functioning than he is willing to acknowledge." (T. 21).

---

[12] The court notes that in February of 2016, plaintiff went to CPEP, the comprehensive psychiatric emergency program at St. Joseph's Hospital in Syracuse (https://www.sjhsyr.org/ find-a-service-or-specialty/behavioral-health/comprehensive-psychiatric-emergency-program-cpep). (T. 255-62).  He complained of worsening depression after his mother's death.  His mental examination, conducted by Psychiatrist Amad Bilal, M.D. found that, although plaintiff was depressed, his affect was full, his speech was clear, his eye contact was good, his psychomotor activity was within normal limits, there were no perceptual disturbances, no delusions, no suicidal or homicidal ideation, his recent and remote memory were intact, his judgment and insight were fair, his thought process was linear and logical, his thought content was within normal limits, he was cooperative, his attention and concentration were fair, and his cognition was intact. (T. 259-60).  He was prescribed medication, but he was not admitted to the hospital, and was referred to the Brownell Center for counseling. (T. 260). The "undated" evaluation may have been plaintiff's initial evaluation at the Brownell Center.

The ALJ may take plaintiff's testimony into account when weighing the evidence. *See Salmini*, 371 F. App'x 109 at 112 (plaintiff's testimony provided substantial evidence in support of the ALJ's conclusion that plaintiff "performs a fairly high level of independent activities of daily living . . . ."). *See also Farszmil v. Comm'r of Soc. Sec.*, No. 1:19-CV-390 (EAW), 2020 WL 3496296, at *4 (W.D.N.Y. June 29, 2020) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)) (The ALJ was entitled to consider plaintiff's daily activities where the ALJ also considered other evidence in the record when discounting the doctor's opinion).

In this case, LCSW Kelodziejski opined in one evaluation that plaintiff was "severely" restricted in his capacity to follow, understand, and remember "simple" instructions and directions, a restriction that she later changed to "moderate." (T. 292, 306). However, plaintiff testified at his hearing that his mother "taught [him] how to clean," and he was "not helpless in that way." (T. 41). Plaintiff also testified that he watched movies and did jigsaw puzzles for fun. (T. 43). Plaintiff stated that in order to watch movies, he had to use an application on his computer,[13] and he explained how that application worked to the ALJ. (T. 56). This testimony is inconsistent with a "severe" inability to follow, understand, and remember simple instructions and directions. Doing jigsaw puzzles is also inconsistent with a severe limitation on the ability to concentrate or to maintain attention. Plaintiff also testified that he did not like to watch a movie more than once because that was boring. (T. 43). This testimony indicates that plaintiff remembered the movies that he watched, which is also inconsistent with severe memory

---

[13] Plaintiff also remembered the name of the application that he used to get the movies. (T. 56).

limitations.  In addition, in her more recent evaluations, LCSW Kelodziejski changed

her assessment of plaintiff's limitations, indicating that he had moderate limitations the

ability to follow, understand, and remember simple instructions as well as perform low

stress, simple and complex tasks independently, and could work a few hours per week.[14]

 

LCSW Kelodziejski's evaluations were also inconsistent with Dr. Shapiro's

evaluation.  Dr. Shapiro found that plaintiff had no limitation understanding simple

directions and performing simple tasks. (T. 241).  He had moderate limitations

performing complex tasks.  Dr. Shapiro's evaluation is more consistent with plaintiff's

testimony.  Dr. Shapiro stated that plaintiff "may" have "mild limitations maintaining

attention and concentration for tasks "*given that he complains of difficulty doing so*" and

mild limitations in making appropriate decisions. (*Id.*) (emphasis added).  Dr. Shapiro

found that plaintiff "appears to have" moderate limitations in his ability to maintain a

routine and adhere to a schedule, learn new tasks, relate with others, and deal with

stress. (*Id.*)  The ALJ did not adopt Dr. Shapiro's finding that plaintiff would have

"moderate" restrictions in maintaining a schedule and a routine. (T. 20).  The ALJ also

did not adopt LCSW Kelodziejski's 2018 finding of moderate restrictions in the ability

to maintain a schedule, nor her earlier opinions of a "severe" restriction in that area.

However, the ALJ's determination does not need to perfectly correspond with any of the

opinions of medical sources cited in her decision, as long as the ALJ made an RFC

---

[14] The court understands that working a "few" hours per week does not rise to the level of substantial gainful activity.  This citation to LCSW Kelodziejski's more recent evaluation is simply to show that the plaintiff's limitations were not as great as she originally wrote and could be considered in conjunction with the other evidence of record to develop plaintiff's RFC.

finding that was consistent with the record as a whole. *Trapanier v. Comm'r of Soc. Sec.*, 752 F. App'x 75, 79 (2d Cir. 2018) (citing *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998)).

In this case, the plaintiff testified regarding his ability to attend his counseling appointments.  He testified that his appointments were "every Thursday, and that he never missed an appointment, unless his counselor called to tell him that it was cancelled. (T. 50-51).  He described how he waited for the medical cab to pick him up and waited at the counselor's office until she came out to see him. (*Id*.)  This is consistent with a finding that plaintiff is capable of maintaining a routine and a schedule.[15]  Even if the ALJ erred in failing to adopt both providers' "moderate" limitations in plaintiff's ability to maintain a schedule, a "moderate" restriction is still consistent with the ability to perform substantial gainful activity, and would at most, be harmless error. *Lowry v. Comm'r of Soc. Sec.*, No. 1:15-CV-1553 (GTS/WBC), 2017 WL 1290685, at *4 (N.D.N.Y. Mar. 16, 2017), *report and recommendation adopted*, 2017 WL 1291760 (N.D.N.Y. Apr. 6, 2017) (moderate limitations in the ability to maintain concentration or a regular schedule or to deal with stress do not prevent a claimant from performing simple, routine work); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (moderate limitations in "relating to instructions, concentration, and attendance" were consistent with unskilled work).

Plaintiff argues that, where an individual's impairments are primarily psychiatric,

---

[15] The court again notes that this testimony is not equivalent to a finding that plaintiff can work. However, it is "consistent" and ability to maintain a schedule, and inconsistent with LCSW Kelodziejski's more severe restrictions.

the opinions of "non-examining and ***consulting*** physicians should be viewed with some skepticism," implying that the ALJ should not have given Dr. Shapiro's opinion as much weight. (Pl.'s Br. at 8) (emphasis added).  However, the cases that plaintiff cites involve "non-examining" physicians and hold that a psychiatric diagnosis should be made on a "personal interview." *See e.g. Ortiz v. Colvin*, No. 3:15-CV-956, 2016 WL 4005605, at *8 (D. Conn. July 26, 2016).  The court in *Ortiz* was referring to a non-examining physician.[16]  Dr. Shapiro was an examining psychologist and personally interviewed the plaintiff before assessing his limitations.  The cases cited by plaintiff do not support the same conclusion with respect to consultative professionals who

---

[16] The court in *Ortiz* specifically stated:

> Indeed, for this reason, "[i]n the context of a psychiatric disability diagnosis, it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007); *see also Rodriguez v. Astrue*, No. 07-CV-534 (WHP/ MHD), 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009) (In the context of a claimant's application for SSI based on a mental disability, the findings of the non-examining physician "should have been discounted or addressed with some skepticism because they were largely inconsistent with the examining physician's findings and did not account for the subjective nature of the patient's disease." (citation and internal quotation marks omitted)). Plaintiff's impairments are primarily psychiatric and thus, the ALJ's reliance on the opinions of the state reviewing non-examining and consulting physicians should be viewed with some skepticism. Where, as here, plaintiff has an established treatment history with not just one, but two, treating physicians, "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient."

2016 WL 4005605, at *8 (alterations in original) (additional citations omitted).  Although one sentence states that the opinions of the state reviewing non-examining and consulting physicians should be viewed with some skepticism, the court was clearly referring to non-examining consultants in it's decision.

personally interview the plaintiff.[17]

Plaintiff testified that his most significant limitation was his inability to interact with others. (T. 37, 41).  As stated above, plaintiff testified that he could probably do everything that anyone else did, except he was slower, but that he "can't work around other people." (T. 41).  Plaintiff testified that he did not trust others, and they were always putting him down. (T. 41).  The ALJ took plaintiff's inability to work with others into account when she determined that the plaintiff could only have "superficial," "occasional" contact with coworkers, supervisors, and the public. (T. 19).  The ALJ also took into account plaintiff's moderate restriction in "pace," by requiring plaintiff to be employed at "goal-oriented," rather than "production-pace" oriented work. (T. 19).

With neither LCSW Kelodziejski's, nor Dr. Shapiro's evaluations deserving of the "controlling" weight afforded to a treating physician, the ALJ justifiably weighed all the evidence, including these reports to establish an RFC which was consistent with the entire record.  It was the ALJ's role to weigh and resolve conflicts in the evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citation omitted).  Although plaintiff argues that to the extent that the ALJ perceives inconsistencies in a treating opinion, she is "obliged" to recontact the physician in an attempt to resolve them. (Pl.'s Br. at 9).  As of 2012, the ALJ is no longer required to recontact the treating source in order to properly develop the record. *See Stack v. Comm'r of Soc. Sec.*, No. 19-CV-466,

---

[17] In fact, the ALJ noted that Dr. Harding's opinion was an "underestimate" of the plaintiff's mental limitations, "given the updated counseling records received at the hearing level" and gave Harding's opinion "partial evidentiary weight." (T. 20).  Dr. Harding was a non-examining State Agency consultant.  Clearly, the ALJ gave consideration to LCSW Kelodziejski's reports in making this determination.

2020 WL 5651601, at *4 (W.D.N.Y. Sept. 23, 2020) (*comparing* 20 C.F.R. § 404.1512 (e)(1) (2011) (we will first recontact your treating physician or other medical source to determine if additional information is readily available) *with* 20 C.F.R. § 404.1520b (b)(2)(i) (2017) ("We may recontact your medical source.")).  The amendment has given the ALJ more flexibility, but does not eliminate the ALJ's duty to develop the record "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Id.* (citations omitted).

However, in this case, LCSW Kelodziejski's opinions are not vague, they were inconsistent with Dr. Shapiro's analysis and also inconsistent with plaintiff's own testimony regarding his daily activities and what he is capable of doing.  The ALJ had sufficient evidence in the record to make the RFC determination, and recontacting the plaintiff's counselor was not required.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED** and this case **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for **DEFENDANT**.

Dated: October 1, 2020

Andrew T. Baxter
U.S. Magistrate Judge